QUENTIN C. LANSMAN ET AL., APPELLANTS, V. STATE OF NEBRASKA, DEPARTMENT OF ROADS, APPELLEE.

128 N. W. 2d 569

Filed May 15, 1964. No. 35643.

120

Vogeltanz & Grimminger, for appellants.

Clarence A. H. Meyer, Attorney General, Harold S. Salter, and Warren D. Lichty, Jr., for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The State of Nebraska, Department of Roads, brought this action against Quentin C. Lansman and Darlene Lansman, owners of certain land, to condemn 23.74 acres of such land for the acquisition of right-of-way for highway purposes. The jury returned a verdict in the amount of $3,824.40. This case had been previously tried to a jury resulting in a verdict for the plaintiffs

in the amount of $5,109. The State filed a motion for new trial which was sustained. Plaintiffs filed a motion for new trial in this case which was overruled. Plaintiffs appeal.

For convenience we will refer to Quentin C. Lansman and Darlene Lansman as plaintiffs, and to the State of Nebraska, Department of Roads, as defendant.

It was stipulated that the condemnation proceedings were commenced on April 4, 1962; that the land condemned is in the east half of Section 12, Township 17 North, Range 15 West of the 6th P.M., in Valley County; and that 23.74 acres were taken by condemnation.

Quentin C. Lansman testified that the land owned by the plaintiffs prior to April 4, 1962, consisted of 480 acres. This land was rolling and hilly pasture land, all in grass. He was asked if an underpass had been constructed on this land. Objection was made to this question, which was sustained. This witness further testified that on the original unit there were two wells; that both wells served the 480 acres; that at the time of trial one well served approximately 360 acres; that access had been provided from the east side of the road by a graded drive from each side of the highway; that no access was provided for under the road; that since the road was constructed it had been necessary to fence both sides of the highway; that prior to the condemnation, as a total unit access to the pasture was easy because cattle could be driven from the northeast corner of the land with no difficulty; that the water supply, prior to the condemnation, was quite adequate when one unit was used carefully; that water is essential to pasturing, and the principal well is located in the center of the total unit; and that the other well is an old one, maintained with difficulty, and served as a supplemental source for the unit. He further testified that since the condemnation the biggest trouble is trying to bring cattle from one side of the unit to the other; and that "It seems to be one of the principal obstacles

to a steer to cross an oiled highway, and the matter of getting a herd across in the absence of any way of doing it, there is no way except hauling them in." His opinion as to the value of the 480 acres prior to the condemnation was $28,800, based on approximately $60 an acre, and immediately after the condemnation the value would be $22,813, amounting to $50 an acre for 456.26 acres. He testified that the fencing would be in addition to this amount, and its cost would be approximately $1,800; that the total amount of these figures, plus depreciation of 457 acres, would total $7,787; that west of the highway there are 360 acres which would pasture approximately 90 to 100 head of cattle; that immediately after the condemnation occurred there was one well on the west side of the highway; also that it will be necessary to have a loading chute and catch pen on the east side of the highway.

Leo Wolfe, a farmer, auctioneer, and licensed real estate broker, testified that he had rented this land for a period of 10 years. He considered the fair and reasonable market value of the land before the condemnation at $60 an acre, and after the condemnation it would be worth at least $10 less an acre. This witness had put in the fence, and gave the cost thereof at approximately $1,700, the cost of labor and machine hire as a little over $900 and the material a little over $800. As to the fair and reasonable market value of the 23.74 acres taken, he fixed this amount at $60 an acre. He further testified that an attempt was made to move cattle across the highway one afternoon, and the first attempt was not successful because the cattle would get their front feet up to the oil and would not cross the highway. With spades, dirt, hay, and grass were moved onto the road, and several attempts were made. Finally a part of the cattle crossed the highway. Some that were shy stayed back and never did cross the highway. This witness further testified that the ASC, or SCS govern-

ment recommendation for wells for pasture grazing is one well for every 160 acres.

E. R. Horner, a well driller who was acquainted with the Lansman land, testified that prior to April 4, 1962, the two wells were adequate, but that at the present time one well cannot take care of the number of acres for the watering of cattle without shifting the cattle from one area to another.

John Andersen, former county judge of Valley County, engaged in selling real estate and who was in the business of handling farms for 12 years, testified that he was acquainted with the plaintiffs' land. He further testified that the reasonable market value of the plaintiffs' land immediately before the condemnation was $30,000, and immediately after the condemnation was $22,180.

Carol Lutz, a resident of Valley County during his lifetime and the owner of 880 acres of land, testified that he had been acquainted with the plaintiffs' land all his life; and that he was vice-chairman of the Valley ASC seed committee and director of the Ord Creamery. He further testified that in his position as chairman of the Valley ASC seed committee, real estate transactions are recorded almost immediately after the sale, and he is acquainted with the value of land in the area. He gave the fair and reasonable market value of the plaintiffs' land immediately before condemnation at $31,200, and immediately after condemnation at $23,296.90.

Walter Zich, a witness for the defendant who is employed by the defendant as an appraiser, testified that he was a licensed real estate broker and was trained in real estate appraisal and agriculture; and that he was familiar with the real estate market in the area where the plaintiffs' property is located and with the plaintiffs' property. He testified as to finding sales of comparable property in the area. He testified that the value of the land taken, at $55 an acre, would amount to $1,306, and in reference to all other matters, including the

fencing, would amount to $1,994, or a total value of $3,300. This witness stated that he had no interest which would affect his opinion as to the value or the fairness in appraising the plaintiffs' property, and that he had never received any instructions relative to the way in which he should appraise property.

James B. Ollis, a resident of Ord, engaged in the real estate business for 40 years, testified that he was familiar with real estate located in the area; that he was a licensed real estate broker; and that he examined the plaintiffs' property and had been familiar with it for many years. He testified with reference to sales of property comparable to plaintiffs' property. He further testified that the separation of the tracts by the new highway made very little difference in the value of the remainder of the land. On cross-examination, with reference to the inconvenience of the wells, he testified that that would amount to "perhaps a dollar or two." He gave as his opinion that the value of the land taken would be $50 an acre, or $1,187; that the fence would be $1,628.75; and that the inconvenience with reference to the wells would be $2, and no severance damage, making a total of damages by reason of the taking and depreciation of the wells $2,817.75.

The plaintiffs assign as error that the verdict is not sustained by sufficient evidence; then complain of instructions given by the trial court for the reason that such instructions did not provide for fencing, for access from one tract of land to the other, or for the inadequate water facilities on one tract of land, and disregarded such items; that the trial court erred in giving instruction No. 10 for the reason that said instruction laid special emphasis on the testimony of defendant's expert witness Zich; and that the trial court erred in sustaining objections made by the defendant to the testimony offered by the plaintiffs with reference to the defendant failing to construct an underpass for the cattle to go under the highway.

There are certain established rules in this jurisdiction relating to condemnation cases as follows.

"The measure of damages for land taken for public use is the fair and reasonable market value of the land actually appropriated and the difference in the fair and reasonable market value of the remainder of the land before and after the taking." Leffelman v. City of Hartington, 173 Neb. 259, 113 N. W. 2d 107. See, also, Armbruster v. Stanton-Pilger Drainage Dist., 169 Neb. 594, 100 N. W. 2d 781; Pieper v. City of Scottsbluff, 176 Neb. 561, 126 N. W. 2d 865.

In Twenty Club v. State, 167 Neb. 37, 91 N. W. 2d 64, this court said: "In condemnation proceedings, where persons are shown to be familiar with the particular land in question, they may be permitted as witnesses to testify as to the value of the tract immediately before and immediately after the appropriation."

The amount of damages sustained by a landowner for the taking of land by eminent domain for a public improvement, and the difference in the fair and reasonable market value of the remainder of the land before and after the taking, is peculiarly of a local nature to be determined by a jury, and its verdict will not be interfered with if it is based on the testimony. See, State v. Wixson, 175 Neb. 431, 122 N. W. 2d 72; State v. Dillon, 175 Neb. 444, 122 N. W. 2d 223; Pieper v. City of Scottsbluff, *supra*.

"The owner of real estate which is taken in condemnation proceedings who is familiar with its value can testify as to its value." Pieper v. City of Scottsbluff, *supra*.

"Generally, either lay or expert witnesses may be used to testify as to the value of a tract of land taken or the value of the remainder thereof immediately before and immediately after the taking if proper foundation is laid showing they have an acquaintance with the property and are informed as to the state of the market, the weight and credibility of their testimony being for the jury. * * * Under ordinary circumstances expert

opinion evidence is to be considered and weighed by the triers of fact like any other testimony." Medelman v. Stanton-Pilger Drainage Dist., 155 Neb. 518, 52 N. W. 2d 328. The court went on to say: " 'Opinion testimony as to value is not conclusive; when uncontradicted, it may be regarded as sufficient proof, but even in such case the jury may exercise their independent judgment.' " The court further said: "Appellants finally contend the verdict of the jury is grossly inadequate and contrary to and not sustained by the evidence. It is true the jury did not exactly follow the evidence of either appellee's or appellants' witnesses in fixing the amount of the recovery. But there is evidence in the record on which they could base their verdict, including their view of the premises.

"As early as Northeastern Nebraska R.R. Co. v. Frazier, 25 Neb. 42, 40 N. W. 604, this court made the observation that: 'The principal question ordinarily is the amount of damages sustained. This question is to be determined from the testimony of experts, that is, persons familiar with the value of the land, and this may include farmers and others. The observation of this court, from the cases which have been before us, is, that juries ordinarily do not adopt the highest or lowest estimates of witnesses, but seem to have endeavored to bring in just verdicts. Nor did the jury in this case adopt the highest estimates of the witnesses.'

"Therein the court went on to hold: 'The question of the amount of damages sustained by a land owner for a right of way condemned across his land is peculiarly of a local nature, proper to be determined by a jury of the county, and the supreme court ordinarily will not vacate or modify the verdict, if it is based upon the testimony in the case.' " There are other cases to this effect such as Kennedy v. Department of Roads & Irrigation, 150 Neb. 727, 35 N. W. 2d 781, and Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168.

In Langdon v. Loup River Public Power Dist., *supra,*

this court said: "When the evidence is conflicting the verdict of the jury will not be set aside, unless it is shown to be clearly wrong." See, also, Grimm v. Elkhorn Valley Drainage Dist., 98 Neb. 260, 152 N. W. 374.

While the evidence in the instant case is in conflict, there is competent evidence in the record to sustain the verdict of the. jury, and we cannot say that it is clearly wrong.

In State v. Wixson, *supra,* this court said: "In a condemnation action the weight and credibility of testimony of either lay or expert witnesses regarding value of land taken or value of remainder immediately before and immediately after taking is for the jury." See, also, Connor v. State, 175 Neb. 140, 120 N. W. 2d 916.

In Graves v. Bednar, 171 Neb. 499, 107 N. W. 2d 12, this court cited Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557, wherein we held: "It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence. * * * It is presumed in such an action that controverted facts were decided by the jury in favor of the successful party, and its finding based on conflicting evidence will not be disturbed unless clearly wrong."

The plaintiffs predicate error on certain instructions as heretofore set out, to the effect that the trial court failed to take into account the fencing, the cost of access from one part of the land to the other, and other matters.

In the case of Armbruster v. Stanton-Pilger Drainage Dist., *supra,* this court said: "Everything which affects the market value is to be taken into consideration. The burden of additional fencing, and like matters, are to be included, not by being added together item by item, but to the extent that, taken as a whole, they detract from the market value of the property." The court went on to say: "* * * in determining the amount of plaintiffs' damages, their expenses for additional fencing, repairs, removal, and rebuilding thereof; * * * and the threatened peril and damages to one of plaintiffs' two valuable

irrigation wells, * * * and like matters, are elements to be considered, not by adding them together item by item and allowing them, or by allowing such item or items as such, but, together with the amount of plaintiffs' land taken * * * such elements should be considered in determining the extent that, taken as a whole, defendant damaged plaintiffs' land by detracting from and reducing the market value thereof."

Crawford v. Central Nebraska Public Power & Irr. Dist., 154 Neb. 832, 49 N. W. 2d 682, is to the same effect, relating to the separate items such as fencing, the burden of the construction thereof, and maintaining the same. The court said: " 'It is a question of damage to the land, as land. * * * Nothing can be allowed for fence, as fence. The allowance should be for the depreciation of the land in consequence of the burden thus cast upon it. Evidence of the cost of suitable fencing is competent as affording a means of arriving at the extent of the burden.' 2 Lewis, Eminent Domain (3d ed.), § 741, p. 1316."

With reference to the failure of the defendant to put an underpass under the highway for the purpose of moving cattle back and forth between the two parcels of land separated by the condemnation proceedings, the jury viewed the premises and could see the condition that existed there with reference to getting back and forth between the two pieces of land. The jury obviously was apprised of all factors which tended to cause damage to the remainder of the plaintiffs' property, and rendered its judgment in accordance with the law relating to condemnation.

"Instructions to a jury must be considered together, so that they may be properly understood, and, if as a whole they fairly state the law applicable to the evidence when so construed, error cannot be predicated on the giving thereof." Graves v. Bednar, *supra*. See, also, Bolio v. Scholting, 152 Neb. 588, 41 N. W. 2d 913; Coyle v. Stopak, 165 Neb. 594, 86 N. W. 2d 758.

An examination of all the instructions under the rule

above mentioned discloses that they fairly and correctly stated the law applicable under the evidence in the instant case.

The plaintiffs predicate error on the giving of instruction No. 10 by the trial court. This instruction reads as follows: "Certian (sic) witnesses have been called who testified as expert witnesses. You are not required to take the opinions of experts as binding upon you, but they are to be used to aid you in coming to a proper conclusion. Their testimony is received as that of persons who are learned by reason of special investigation and study (or experience) along lines not of general knowledge, and the conclusion of such persons may be of value. You may adopt, or not, their conclusions, according to your own best judgment, giving in each instance such weight as you think should be given under all the facts and circumstances of the case."

It is the contention of the plaintiffs that the witness Zich was an employee of the Nebraska Department of Roads, was salaried, and that his employment depended upon his testimony as an appraiser. It is further contended that instruction No. 10 unduly emphasized the testimony of Zich as an expert who had only been in Valley County two or three times, had studied the records, but knew nothing of Valley County except what he had learned the two or three times he was there.

This instruction does not apply to Zich alone, but also to Leo Wolfe, John Andersen, and James B. Ollis. It is an instruction which has been given on many occasions. We find no prejudicial error in the giving of this instruction.

In Lilienthal v. Platte Valley Public Power & Irr. Dist., 134 Neb. 281, 278 N. W. 492, this court said: "The jury had the opportunity of seeing the premises in question, and their view thereof may be considered as evidence upon which they based their verdict. A verdict based on the evidence, where the jury have been permitted to view the premises, will not be disturbed un-

130

less clearly wrong. Fremont, E. & M. V. R. Co. v. Meeker, 28 Neb. 94, 44 N. W. 79."

We find no prejudicial error in the record. The judgment of the trial court is affirmed.

AFFIRMED.